IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>ASCENT CONSTRUCTION, INC., a Utah corporation, BRADLEY L. KNOWLTON, an individual, and ASCENT CONSTRUCTION, INC. EMPLOYEE STOCK OWNERSHIP PLAN, an employee benefit plan,<br>　　　　　　　　　　Defendants. | MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br><br>Case No. 1:23-cv-0047-TS-DAO<br><br>Judge Ted Stewart<br><br>Magistrate Judge Daphne A. Oberg |

　　　　This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction to Prevent Further ERISA Violations[1] filed on May 2, 2023. For the reasons discussed below, the Court will grant the Motion.

I. BACKGROUND

　　　　Plaintiff sues Defendants pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") for violations of fiduciary duties.[2] At issue is the Ascent Construction, Inc. Employee Stock Ownership Plan (the "Plan"), which is an employee benefit plan set up to provide retirement income to former employees of Ascent Construction ("Ascent").[3] Ascent engages in the business of commercial contracting, engineering, and construction and is the

---

[1] Docket No. 12.

[2] 29 U.S.C. §§ 1001–1191c.

[3] Docket No. 1 ¶ 6.

1

Plan's administrator.[4] Bradley L. Knowlton is the President, Chief Executive Officer, and co-owner of Ascent, and the Plan's Trustee.[5]

In 2020, when the Plan's individual account balances were last calculated, the Plan had $460,189.22 in cash assets.[6] Plaintiff alleges that Knowlton made several withdrawals from the Plan from September 21, 2021 to March 8, 2022, totaling approximately $311,250.95, and deposited those funds into Ascent's corporate accounts, including operating and payroll accounts.[7] Plaintiff also alleges that Knowlton and Ascent failed to distribute funds totaling approximately $30,129.91 to Ron Bagley, a Plan participant.[8] Plaintiff asserts that the Plan's asset custodian, AllianceBernstein, issued a check to Knowlton for Bagley for $30,129.91, but Knowlton never deposited it, so Bagley did not receive what he was owed.[9] As of August 3, 2022, the Plan had 53 participants and the AllianceBernstein account had a value of $141,139.26.[10]

Plaintiff alleges that on April 5, 2023, Knowlton requested that AllianceBernstein reissue Ron Bagley's $30,129.91 check, but also asked to withdraw approximately $100,000 from the Plan's general investment account.[11] Prior to any disbursement, AllianceBernstein notified Peter Thai, an Employee Benefits Security Administration Investigator with the Department of Labor,

---

[4] *Id.* ¶ 7.

[5] *Id.* ¶ 8.

[6] Docket No. 12-1, at 3.

[7] Docket No. 1 ¶¶ 2, 11; Docket No. 12, at 6.

[8] Docket No. 1 ¶¶ 2, 12.

[9] *Id.* ¶ 12.

[10] *Id.* ¶ 13. Defendant asserts that as of April 5, 2023, the Plan assets totaled $136,000 due to "economic downturn." Docket No. 27, at 22.

[11] Docket No. 1 ¶ 14; Docket No. 12, at 7–8.

of Knowlton's request to empty the Plan.[12] AllianceBernstein did not disburse any funds to Knowlton based upon Thai's request and notification of this suit.[13] Knowlton asserts that he was moving the money to another account to more easily make disbursements to participants.[14]

The most recent disbursement requests were made after the Department of Labor put Knowlton on notice regarding the unlawful handling of the Plan's funds from September 2021 to March 2022, and while the Department of Labor and Knowlton's attorney were involved in ongoing discussions and negotiations regarding Knowlton's handling of the Plan.[15] These events, in addition to the most recent April 2023 request for funds, form the basis for Plaintiff's request for a "preliminary injunction immediately removing Knowlton as the [P]lan's trustee and Ascent as the [P]lan administrator and to enjoin them from exercising any authority or control of the [P]lan and its assets."[16] Plaintiff also "requests the Court appoint an independent fiduciary to assume control of and administer the [P]lan."[17] In total, Plaintiff alleges eight ERISA violations against Ascent and Knowlton each while acting in their fiduciary capacities.[18]

## II. DISCUSSION

To obtain a preliminary injunction, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4)

---

[12] Docket No. 12, at 8.
[13] *Id.*
[14] Docket No. 27, at 6.
[15] Docket No. 1 ¶ 14.
[16] Docket No. 12, at 5.
[17] *Id.*
[18] Docket No. 1 ¶ 15.

that the injunction is in the public interest."[19] "[A] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule."[20]

A. BURDEN

Courts disfavor preliminary injunctions that (1) mandate action (instead of prohibiting it); (2) change the status quo; or (3) grant all the relief that the moving party could expect from a trial win.[21] If the moving party is seeking a disfavored injunction, it "faces a heavier burden on the likelihood-of-success-on-the merits and the balance-of-harms factors: [the party] must make a 'strong showing' that these tilt in [their] favor."[22] Defendants argue that Plaintiff's proposed preliminary injunction contains each of these disfavored attributes. The Court agrees that the proposed injunction seeks to alter the status quo.

"[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing'"[23] or the "last peaceable uncontested status."[24] "In determining the status quo for preliminary injunctions, th[e] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."[25] Here, the last peaceable uncontested status was when Knowlton and Ascent were the Trustee and Administrator of the Plan prior to the transactions at issue. Therefore, Plaintiff seeks to alter the status quo by seeking to remove Defendants and appoint a new fiduciary to

---

[19] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).

[20] *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

[21] *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019) (citing *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

[22] *Id.* (quoting *Fish*, 840 F.3d at 724).

[23] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005) (quoting *Dominion Video Satellite Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)).

[24] *Id.* (internal quotation marks and citation omitted).

[25] *Dominion*, 269 F.3d at 1155.

administer the Plan. As such, the Court will apply the heightened standard to the preliminary injunction analysis.

B. PRELIMINARY INJUNCTION FACTORS

Where, as here, a plaintiff seeks a preliminary injunction that disturbs the status quo, that request "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."[26] "[A] party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."[27] Accordingly, "the right to relief must be clear and unequivocal."[28]

*1. Irreparable Harm*

"Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered."[29] "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."[30] "[T]he movant must demonstrate a significant

---

[26] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).

[27] *Id.* at 976.

[28] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)).

[29] *DTC Energy Grp. v. Hirschfeld,* 912 F.3d 1263, 1270 (10th Cir. 2018) (alteration in original) (internal quotation marks and citation omitted).

[30] *Id.* (internal quotation marks and citations omitted).

risk that he or she will experience harm that cannot be compensated after the fact by money damages."[31] This is "not an easy burden to fulfill."[32]

"[S]imple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."[33] Further a movant's delay in filing a motion for injunctive relief suggests a lack of immediacy and irreparable harms.[34]

Defendants argue that Plaintiff's delay in seeking the preliminary injunction undermines the claim of irreparable harm.[35] They argue that Investigator Thai has known about the "urgent" situation since January 2022,[36] but Plaintiff filed for an injunction on May 2, 2023.[37] The Tenth Circuit previously held that a three-month delay in filing for injunctive relief did not defeat a claim of irreparable injury when the delay was attributable to plaintiff's attempts to negotiate and the need for further documentation of the harm.[38] Here, Plaintiff asserts the delay in filing the Complaint and the Motion was due to negotiations and further investigation as the Department was not yet aware of Defendants' full conduct concerning the Plan.[39] It is unclear when Plaintiff learned of these violations. However, after Plaintiff learned of the most recent attempt to withdraw the remaining Plan assets, the Department acted quickly in filing the Complaint and

---

[31] *Id.* (internal quotation marks and citations omitted).

[32] *Greater Yellowstone Coal.*, 321 F.3d at 1258.

[33] *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003).

[34] *GTE Corp.*, 731 F.2d at 678.

[35] Docket No. 27, at 14.

[36] *Id.* at 15–16.

[37] Docket No. 12.

[38] *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994); *see also RoDa Drilling Co.*, 552 F.3d at 1211–12 ("[T]he record clearly establishes that RoDa's delay in filing its complaint arose from its attempts to resolve the dispute, rather than a decision to merely to 'sit on its rights.'").

[39] Docket No. 30, at 5–6.

seeking an injunction. Therefore, the Court finds that Plaintiff's delay does not undermine the claim of irreparable harm.

Defendants also argue that Plaintiff cannot show threat of irreparable harm because the harm is purely monetary. While monetary harm that can be compensated after the fact is not a basis for a preliminary injunction, courts have concluded irreparable harm exists where the monies may not be collectible in the future.[40]

In a separate legal action, Defendants are being sued by Zurich American Insurance Company and Fidelity and Deposit Company of Maryland ("Zurich") in the District of Utah for millions of dollars.[41] Zurich filed the case in July 2020 alleging six claims against Knowlton and Ascent,[42] including breach of contract, indemnification and unjust enrichment among other claims involving Zurich and Ascent's surety relationship.[43] Zurich acted as surety for Ascent (the principal) for approximately twenty construction projects in Utah exceeding $200 million in bonds.[44] Defendants executed a number of general indemnity agreements prior to issuance of any bonds from Zurich, agreeing to defend and indemnify Zurich from losses and reimburse Zurich for losses arising out of the bonds. Beginning in 2019, Zurich began receiving several bond

---

[40] *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009); *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 97 (6th Cir. 1982); *Transamerica Ins. Fin. Corp. v. N. Am. Trucking Ass'n, Inc.*, 937 F. Supp. 630, 634 (W.D. Ky. 1996).

[41] *Zurich Am. Ins. Co. v. Ascent Const., Inc.*, No. 1:20-cv-00089-DBB-CMR. As of October 2022, Zurich alleges losses of approximately $30 million in resolving surety bond claims arising from Ascent projects. ECF No. 337, at 20.

[42] Additionally, Zurich sues Knowlton's ex-wife Shondell Swenson, and Scott and Marlaine Johansen all as individual indemnitors of Zurich.

[43] *Zurich A. Ins. Co. v. Ascent Constr., Inc.*, No. 1:20-cv-00089-DBB-CMR, ECF No. 337, at 20; ECF No. 2.

[44] *Zurich Am. Ins. Co. v. Ascent Constr., Inc*, No. 1:20-cv-00089-DBB-CMR, ECF No. 337, at 20; ECF No. 18, at 13–14.

7

claims from project owners. Zurich alleges that Defendants failed to comply with the indemnity agreements and that they owe "dozens, if not hundreds, of local subcontractors/suppliers."[45] Additionally, Zurich alleges that Knowlton used project funds intended for those subcontractors and suppliers.[46] Zurich currently has a summary judgment motion pending in the case.

Zurich is also suing Knowlton and Ascent in the Third District Court of Utah alleging that Ascent made transfers to insider defendants with intent to hinder, delay, or defraud Zurich in violation of Utah code.[47] In that case, Zurich asserts that Ascent transferred approximately $700,000 in bonded contract funds to the Plan to benefit himself and others.[48]

In a deposition taken in early 2022, Knowlton stated that Ascent has no ongoing construction projects and no upcoming projects.[49] He also discussed the mass exodus of employees from Ascent which employed up to 130 employees in June 2019, but by 2021 only had two or three employees.[50] Additionally, Investigator Thai stated that Knowlton reported Ascent was in financial distress and former employees told Thai that Ascent was no longer operating.[51] As such, while the harm here is monetary, it appears likely that the Plan funds will not be recoverable should Knowlton be allowed to continue as fiduciary, especially since many of the employees entitled to the funds will not be eligible for disbursements until at least 2024 or

---

[45] *Zurich Am. Ins. Co. v. Ascent Constr., Inc*, No. 1:20-cv-00089-DBB-CMR, ECF No. 2 ¶ 32.

[46] *Zurich Am. Ins. Co. v. Ascent Constr., Inc*, No. 1:20-cv-00089-DBB-CMR, ECF No. ¶ 25.

[47] *Zurich Am. Ins. Co. v. Ascent Constr., Inc. et al.*, No. 200907502.

[48] *Zurich Am. Ins. Co. v. Ascent Constr., Inc. et al.*, No. 200907502, Docket No. 36, at 17.

[49] Docket No. 30-2, at 205. He also stated that Ascent had not bid on new work since 2020. *Id.* at 206.

[50] *Id.* at 208–09. In January 2020, Knowlton estimated that Ascent had fewer than 30 employees. *Id.* at 209.

[51] Docket No. 12-1, at 10.

2025. While AllianceBernstein has frozen the Plan's remaining assets,[52] it is unclear how long that can continue. Further, Mr. Bagley is still owed his disbursement, and new requests for disbursements could begin next year as employee's disbursements begin to vest, making a new fiduciary necessary. Based on these facts, the Court finds there would be irreparable harm if the preliminary injunction is not issued. Therefore, this factor weighs in favor of the injunction.

    *2. Substantial Likelihood of Success on the Merits*

"The heightened standard applicable to a disfavored preliminary injunction requires the Plaintiff[] to make a strong showing that their [claims are] substantially likely to succeed on its merits."[53] Plaintiff alleges eight ERISA violations each against Ascent and Knowlton.[54] As a preliminary matter, Plaintiff sufficiently demonstrates that the Plan is an ERISA-covered plan; Ascent, as the Plan's sponsor, employer, and administrator is a party in interest and fiduciary to the Plan within the meaning of ERISA;[55] and, as the only trustee, Knowlton is a fiduciary and party in interest to the Plan.[56] The Court will address the claims in turn below.

    a. 29 U.S.C. § 1104(a)(1)(A)

Section 1104(a)(1)(A) requires that a fiduciary discharge their duties "with respect to a plan solely in the interests of the participants and beneficiaries and . . . for the exclusive purpose of . . . . providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan" Plaintiff asserts that Defendants' most recent attempt to "drain the Plan's assets along with past Plan asset misappropriations" demonstrate this

---

[52] *Id.* at 8.

[53] *Free the Nipple*, 916 F.3d at 798 (citing *Fish*, 840 F.3d at 723–24).

[54] Docket No. 1 ¶ 15.

[55] 29 U.S.C. §§ 1002(14)(A), (C), (16), and (21)(A).

[56] *Id.* §§ 1002(21)(A), (14)(A), (C), (E), and (H).

violation.[57] In support of this claim, Plaintiff provides the following: bank records showing an $11,250 deposit from the Plan's checking account into Ascent's operating account at Sunwest Bank, which Knowlton used to pay business expenses of Ascent during the same month (August 2020);[58] Investigator Thai's declaration that Knowlton transferred $300,000 of Plan assets on September 21, 2021, into Ascent checking accounts to pay various business transactions involving operations and payroll from September 2021 to March 2022, including using funds to pay himself and Olga Velazquez, one of Ascent's last remaining employees;[59] bank account records evidencing these transactions; account agreements showing that Knowlton is the only signatory listed on the Plan's checking account, Ascent's Sunwest Bank operating account, and Ascent's Sunwest Bank's Payroll Account, and show Knowlton must have authorized any transfer from these accounts;[60] and finally, declarations of Investigator Thai and former Ascent employee, Ron Bagley, that Bagley was eligible for a $30,129.91 distribution when he requested it in 2019, but Knowlton repeatedly failed to pay him, despite ongoing requests.[61] Plaintiff demonstrates that these actions were not taken for the benefit of the Plan or its participants or beneficiaries, but instead for the benefit of Knowlton and Ascent.

Furthermore, Knowlton states in his own declaration that the Plan transferred $300,000 to Ascent "for the purpose of purchasing additional shares of Ascent."[62] Plaintiff points out that Knowlton previously represented through his attorney that the $300,000 transfer was a personal

---

[57] Docket No. 12, at 10.

[58] Docket No 12-1, at 4; Docket No. 12-3, at 20, 22–25.

[59] Docket No. 12-1, at 5–6; Docket No. 12-3, at 84, 88, 94, 99, 101, 103, 105, 109 (Sunwest Bank Plan Checking Account statements).

[60] Docket No. 12-1, at 6–7; Docket No. 12-3, at 65–66, 260–61, 263–64.

[61] Docket No. 12-1, at 7–8; Docket No. 30-5, at 2–3.

[62] Docket No. 27, at 5.

loan that he would pay back.[63] Whether he was buying stock or loaning himself money, both are prohibited under ERISA.[64] Further, any purchase of company stock would not benefit Plan participants or their beneficiaries given that Ascent has had few employees and no construction contracts since 2020.[65]

Based upon on the evidence presented, the Court finds that Plaintiff has made a strong showing of likelihood of success on the merits as to this claim.

b. 29 U.S.C. § 1104(a)(1)(B)

Section 1104(a)(1)(B) requires an ERISA fiduciary to act solely in the interest of participants and beneficiaries, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." "The prudence analysis centers on 'whether the [fiduciary], at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'"[66] Based on the evidence above, the Court finds that Plaintiff has made a strong showing of substantial likelihood of success on the merits as to this claim.

---

[63] Docket No. 30, at 8–9.

[64] *See* 29 U.S.C. § 1106(b) ("A fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual . . . capacity act in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries . . . ."); *Id.* § 1108(e)(1) (stating that ERISA does not prohibit an "acquisition, sale or lease" if it "is for adequate consideration").

[65] Docket No. 30-2, at 206.

[66] *Martin v. Harline*, No. Civ.A 87-NC-115J, 1992 WL 12151224, at *13 (D. Utah Mar. 30, 1992) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)).

c. 29 U.S.C. § 1104(a)(1)(D)

Section 1104(a)(1)(D) requires an ERISA fiduciary to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with provisions of [ERISA]." Here, "the Plan states it is meant to comply with ERISA and all formal regulations and rules."[67] Therefore, Defendants' alleged self-dealing with Plan assets as detailed above demonstrates a strong showing of a substantial likelihood of success as to this claim.

d. 29 U.S.C. § 1103(c)(1)

Section 1103(c)(1) provides that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." Based on the evidence discussed above, the Court finds that Plaintiff made a strong showing that Defendants used Plan assets outside of the exclusive benefit of Plan participants and, therefore, demonstrate a substantial likelihood of success as to this claim.

e. 29 U.S.C. §§ 1106(a)(1)(D), (b)(1), (2)

Section 1106(a)(1)(D) prohibits a fiduciary from engaging in a transaction, "if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." Sections 1106(b)(1) and (2) state that a fiduciary "shall not . . . deal with the assets of the plan in his own interest or for his own account," or "in his individual or in any other capacity in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries." Based on the evidence Plaintiff presented, the Court finds that

---

[67] Docket No. 12-2, at 11. ("This Plan is continued and maintained by Ascent Construction, Inc. . . . for the benefit of its Employees . . . .").

Plaintiff has established a strong showing of likelihood of success on the merits for each of these claims.

      f. 29 U.S.C. 1105(a)(3)

Section 1105(a)(3) provides that in addition to any other liability under ERISA, "a fiduciary shall be liable for breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." Plaintiff does not address this claim specifically; however, she appears to be operating under the theory that both Ascent and Knowlton had knowledge of breaches by the other and failed to undertake reasonable efforts to remedy them.[68] Based on the evidence, Plaintiff makes a strong showing of likelihood of success on the merits as to this claim.

Based on the foregoing, the Court finds that this factor weighs in favor of granting the injunction.

      *3. Balance of Hardships*

Under the heightened standard, Plaintiff needs to make a strong showing that the balance of hardships weighs in her favor.[69] Defendants erroneously argue that there will be no harm to the government as "none of the government's assets are actually at risk."[70] However, courts have recognized the need to "protect[] against future harm to ERISA plans"[71] that "would leave . . . participants without benefits whose security ERISA strives above all else to protect."[72]

---

[68] Docket No. 1, at 8.

[69] *See Free the Nipple*, 916 F.3d at 801.

[70] Docket No. 27, at 21.

[71] *Solis v. Hutcheson*, No. 1:12-cv-236-EJL, 2012 WL 2151525, at *6 (D. Idaho June 13, 2012).

[72] *Johnson*, 572 F.3d at 1081.

Defendants also argue that the injunction would cause harm to the Plan because if the injunction is granted, the Plan will be emptied to pay for an independent fiduciary.[73] While the Plan will have to pay a fee or fees for the independent fiduciary, based upon Defendants' alleged use of the Plan assets for personal benefit and the importance of protecting the Plan from future harm, the Court finds that this factor weighs in favor of granting the injunction.

*4. Public Interest*

Finally, before granting an injunction, a court must "weigh the case-specific equities in favor of both parties and the public interest."[74] Plaintiff argues that issuance of a preliminary injunction will not be adverse to public interest as "Congress declared a national public interest in protecting 'the continued well-being and security of millions of employees and their dependents . . . directly affected by [ERISA] plans.'"[75] The Court agrees. Based on public interest in protecting ERISA plans, the Court finds that this factor also weighs in favor of issuing the preliminary injunction.

### III. CONCLUSION

Plaintiff has sufficiently established the factors necessary for injunctive relief. Therefore, the Court will grant Plaintiff's Motion for Preliminary Injunction and issue a preliminary injunction to remove Defendants from their fiduciary duties as administrator and trustee and appoint an independent fiduciary to manage the Plan.

It is therefore

ORDERED that Plaintiff's Motion for Preliminary Injunction (Docket No. 12) is GRANTED. The Court will issue the preliminary injunction in a separate filing.

---

[73] Docket No. 27, at 21–22.

[74] *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir. 2012).

[75] Docket No. 12, at 14 (quoting 29 U.S.C. § 1001(a)).

DATED this 3rd day of July, 2023.

                          BY THE COURT:

                          _____
                          TED STEWART
                          United States District Judge